## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANIS STACY, | : | |
| | : | |
| Plaintiff | : | **CIVIL ACTION NO.: 10-_____** |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| LSI CORPORATION and | : | |
| AGERE SYSTEMS, INC, | : | |
| | : | |
| Defendants | : | |

## COMPLAINT

## INTRODUCTION

1.      In 2008, Plaintiff Janis Stacy's ten years of employment with the Defendants came

to an abrupt end, when she was terminated from her position of Principal Product Engineer, and

denied the opportunity to transfer to another position.  At that time, Ms. Stacy was told directly

that she was being terminated in order to allow her to "break free" from negative reactions within

the company to her disclosure of her gender identity (female) and her subsequent transition from

male to female.  As set forth at greater length below, this expressly discriminatory termination –

and the accompanying refusal to permit Ms. Stacy to transfer or be rehired into other positions

within the company – was in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. § 2000e, *et seq.*, the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et*

*seq.*, and the Allentown Human Relations Act (AHRA), § 181.01, *et seq.*

## PARTIES

2.      Plaintiff Janis Stacy is an adult citizen of the United States, who currently resides

at R.R. 2, Box 500GG, Kunkletown, PA 18058.

3.      During the course of her employment with Defendants, Ms. Stacy worked out of two offices: 555 Union Boulevard, Allentown, PA 18109 and 1110 American Parkway NE, Allentown, PA 18109.

4.      Defendant Agere Systems, Inc. ("Agere Systems") is a technology company with offices at 555 Union Boulevard, Allentown, PA 18109 and 1110 American Parkway NE, Allentown, PA 18109.

5.      Defendant LSI Corporation ("LSI") is a technology company with offices at 555 Union Boulevard, Allentown, PA 18109 and 1110 American Parkway, NE, Allentown, PA 18109.

6.      Agere Systems was spun off from Lucent Technologies in or around 2002.

7.      On information and belief, LSI (then LSI Logic) and Agere Systems merged in April 2007, at which time Agere Systems became a wholly owned subsidiary of LSI.

8.      On information and belief, Ms. Stacy was employed by Agere Systems (or its predecessor Lucent) from 1998 until the date of her termination.

9.      In addition, or in the alternative, Ms. Stacy was employed by LSI from the date of its merger with Agere Systems through the date of her termination.

10.     In addition, or in the alternative, LSI has acted as a "joint employer" or "integrated enterprise" with Agere Systems since the April 2007 merger.  Among other things, on information and belief, the following facts have been true since the time of the April 2007 merger (or shortly thereafter):

(a)      LSI and Agere Systems have shared common management;

(b)      LSI and Agere Systems have shared common ownership or financial control;

- 2 -

(c)     LSI and Agere Systems have had a centralized, unitary human resources

        department;

(d)     LSI and Agere Systems have had a centralized, unitary legal department;

(e)     LSI has dictated the adoption and/or content of some or all Agere Systems

        personnel policies;

(f)     LSI has had the authority to dictate hiring and firing decisions at Agere Systems;

(g)     LSI has had the authority to supervise and discipline Agere Systems employees;

(h)     LSI has exercised substantial control over the compensation and terms and

        conditions of employment of Agere Systems employees;

(i)     Agere Systems employees have received benefits in accordance with LSI policies,

        and have been a part of LSI's pension and welfare benefits plans;

(j)     LSI personnel were involved in the personnel decisions at issue in the instant case;

(k)     LSI personnel were involved in the final decision regarding which groups would

        be included in Agere Systems' non-discrimination policy after the merger;

(l)     Specifically, LSI personnel were involved in the decision to remove gender

        identity from Agere Systems' non-discrimination policy after the merger;

(m)     LSI and Agere Systems have had a joint website;

(n)     Agere Systems employees have regularly used letterhead with LSI's name and

        logo;

(o)     LSI's logo and name has been listed on all Agere Systems paychecks, including

        Ms. Stacy's;

(p)     All Agere Systems and LSI employees have had LSI email addresses;

(q)     Through the above measures, among others, LSI and Agere Systems have held

themselves out as a single entity both externally and to their own employees.

11.     This Complaint will use the term "Defendants" to refer collectively to LSI

Corporation, Agere Systems, and their predecessors.

## JURISDICTION, VENUE AND JURY DEMAND

12.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal

claims), 28 U.S.C. § 1367 (state claims), and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

13.     Venue is appropriate in this District because a substantial part of the events or

omissions giving rise to the claims herein occurred in this judicial district.

14.     Venue is appropriate in this District under Title VII's venue provisions because

this is the judicial district in which Ms. Stacy would have worked but for her unlawful

termination, in which employment records relevant to such termination are maintained, and in

which Ms. Stacy's unlawful termination is alleged to have been committed, within the meaning

of 42 U.S.C. § 2000e-5(f)(3).

15.     Ms. Stacy filed a timely charge of discrimination against Defendants with the

Pennsylvania Human Relations Commission ("PHRC"), which was dual filed with the Equal

Employment Opportunity Commission ("EEOC").  Ms. Stacy also filed a timely charge of

discrimination against Defendants with the Allentown Human Relations Commission ("AHRC").

16.     Through the forgoing actions described in Paragraph 15, Ms. Stacy exhausted her

administrative remedies.

17.     Ms. Stacy demands a trial by jury as to all matters triable by a jury.

- 4 -

## STATEMENT OF FACTS

18.     Ms. Stacy was hired by Lucent Technologies in March 1998.

19.     At that time, Ms. Stacy presented herself as a man, had the physical attributes of a man, had a masculine appearance and demeanor, and was known by the traditionally masculine name "Jim."

20.     As "Jim," Ms. Stacy consistently received positive feedback regarding her work performance, and received steadily increased compensation.

21.     In 2001, as "Jim," Ms. Stacy was promoted from Member of the Technical Staff to Distinguished Member of the Technical Staff.

22.     Promotion from Member of the Technical Staff to Distinguished Member of the Technical Staff was a significant promotion that – at the time – could only be approved upon a determination by a review committee that the employee had made a highly significant contribution to the company.

23.     Ms. Stacy was diagnosed with gender identity disorder in 2002.

24.     Gender identity is a person's internal psychological identification as a man or woman.  "Gender identity disorder" is a medical condition in which a person's gender identity does not match their designated birth sex.  For people with gender identity disorder, the conflict between their gender identity and their designated birth sex causes extreme psychological distress and intense feelings of discomfort.

25.     The leading professional association for those who specialize in the medical treatment of people with gender identity disorder is known as the World Professional Association for Transgender Health ("WPATH," formerly known as the Harry Benjamin International Gender

- 5 -

Dysphoria Association).  WPATH has developed standards of care for the treatment of gender identity disorder that are widely accepted by medical professionals.

26.     As set forth in the WPATH standards of care, treatment for gender identity disorder is focused on three major components.  These components are referred to as "triadic treatment" and involve: 1) taking hormones of the gender with which the person identifies; 2) undergoing a "real life experience," *i.e.*, living full time in the gender with which the person identifies; and 3) surgery to change the sex characteristics of the individual to their desired sex, *i.e.*, sex reassignment surgery.  All of these components are recognized by WPATH as being medically necessary for the treatment of gender identity disorder.

27.     From late 2002 through the beginning of 2004, Ms. Stacy engaged in treatment consistent with the standards of care, including taking female sex hormones and presenting as female in various contexts.  Starting in early 2004, Ms. Stacy began to present herself exclusively as female outside of the work context.

28.     Between 2002 and early 2005, Ms. Stacy continued to present herself as a man at work, for fear that she would suffer discrimination at work if she were to disclose her diagnosis and her true gender.  Ms. Stacy also paid for all gender-identity related treatments out of pocket instead of seeking insurance reimbursement during this time frame, to avoid any potential for discriminatory treatment by her employer.

29.     In early 2005, Ms. Stacy determined, in conjunction with her treatment provider, that it was medically necessary for her to move to the next stage of treatment for her gender identity disorder, which would involve facial surgery, and subsequently, sex reassignment surgery.  Because Ms. Stacy's facial surgery would significantly alter her appearance, and

because she needed to live "full time" as a woman for one year before qualifying for sex reassignment surgery, Ms. Stacy determined that she would need to inform her employer of her condition.

30.     During January of 2005, Ms. Stacy began meeting with Human Resources to advise them of her impending transition, and to enlist their assistance in disclosing her gender and diagnosis to her workplace.  Shortly thereafter, in February 2005, Ms. Stacy met with Human Resources, George Stasak (Ms. Stacy's second level supervisor) and Necip Sayer (Mr. Stasak's supervisor), at which time she disclosed her diagnosis and gender to Mr. Stasak and Mr. Sayer.

31.     Shortly following this meeting, in February 2005, Ms. Stacy was permitted to present two presentations to her co-workers, explaining her impending transition, and allowing them the opportunity to ask questions.  Human Resources also separately met with small groups of Ms. Stacy's co-workers to explain her transition.

32.     Mr. Stasak opposed these presentations, but was overruled by Human Resources and Mr. Sayer, who believed that Ms. Stacy's co-workers should be informed of her transition.

33.     In or around March 2005, Ms. Stacy took a previously scheduled leave of 3 or 4 weeks, in order to undergo facial feminization surgery.  When she returned to work, she returned as "Janis" or "Jan," and presented herself with a traditionally feminine appearance.  Among other things, Ms. Stacy's facial structure had been altered by surgery, she wore a feminine wig (after having been bald), began to wear makeup and feminine attire and accessories, and used a higher, more feminine voice.

34.     Following Ms. Stacy's disclosure and gender transition, Mr. Stasak's treatment of Ms. Stacy abruptly changed.  For example, he avoided having contact with Ms. Stacy, and ceased coming to her office.

35.     In contrast, prior to Ms. Stacy's disclosure and gender transition, Mr. Stasak frequently consulted Ms. Stacy on work-related matters and relied upon her greatly as a valued employee.

36.     Following her disclosure and gender transition, Ms. Stacy also received decreased compensation for the first time during her employment with Defendants, experiencing a more than $4,000 drop in compensation between the years 2004 and 2005.

37.     In contrast, prior to her disclosure and gender transition, Ms. Stacy had received steadily increased compensation throughout her employment with Defendants, increasing her compensation by an average of approximately $7,000 per year between 1999 and 2004.

38.     On or around February 27, 2006, Ms. Stacy underwent sex reassignment surgery. Due to the lengthy recovery period required, she took approximately 6 weeks leave following the surgery.

39.     In mid 2006, shortly following Ms. Stacy's return to work, she was transferred from Mr. Stasak's organization to a new organization within the company.

40.     In the new organization, Ms. Stacy reported to Robert Radaker as her immediate supervisor, with Director Norm Lawrence – a friend of Mr. Stasak's – as her second level supervisor.

41.     At the end of 2006, Ms. Stacy received a review and compensation that did not fairly reflect her performance.

42.     As in 2005, Ms. Stacy's compensation in 2006 remained below the level of compensation that she had received prior to the disclosure of her gender identity and gender transition.

43.     Throughout 2007, Ms. Stacy repeatedly received outstanding feedback from Mr. Radaker relating to her performance, including being told that she was the "best product engineer" he had ever worked with.

44.     In accordance with this verbal feedback, Mr. Radaker sought to rate Ms. Stacy as "outstanding" in late 2007/early 2008, in connection with her 2007 performance.

45.     Mr. Radaker's ratings for Ms. Stacy were downgraded by Mr. Lawrence, against Mr. Radaker's recommendation.

46.     In late 2007/early 2008, Ms. Stacy learned that layoffs were likely to occur in the company, and that it was possible that she would be considered for termination at that time.  As a result, in January/February 2008 (both prior to and following notification of the layoff determination), she applied for several alternate positions with Defendants, including positions in Allentown, Pennsylvania (as an IC Test Sourcing Engineer), Minnesota (two applications for positions as a Storage Product Engineer) and California (as a Customer Quality and Reliability Engineer).

47.     Despite her outstanding qualifications, Ms. Stacy did not receive an offer of employment for any of the above-referenced positions. On information and belief, gender identity, sex and/or disability-based bias against Ms. Stacy played a role in the refusal to hire her into any of the above-referenced positions.

48.     On January 15, 2008, Ms. Stacy was informed by Robert Radaker that she was being laid off.

49.     She subsequently asked Mr. Lawrence why she had been selected for layoff, and was told that it was to allow her to break free of her "problems with George" and her "negative history" with the company.

50.     Aside from Mr. Stasak's disapproval of Ms. Stacy's gender transition, Ms. Stacy has never had any "problems with George."

51.     Aside from disapproval within the company of Ms. Stacy's gender transition, Ms. Stacy has never had any "negative history" at the company.

52.     On information and belief, the forgoing downgrade of Ms. Stacy's rankings, and termination by Defendants occurred shortly after "gender identity" was removed from the non-discrimination policy applicable to Ms. Stacy.

53.     Specifically, on information and belief, Defendants modified the non-discrimination policy applicable to Ms. Stacy to remove the non-discrimination protections for gender identity in or around November 2007.

54.     On information and belief, at the time of the layoffs, Ms. Stacy was one of four Principal Product Engineers in her group.  On information and belief, Ms. Stacy was the only one of the four who was selected for termination.

55.     On information and belief, none of the other three Principal Product Engineers was a woman, gender non-conforming or transsexual.

56.     On information and belief, none of the other three Principal Product Engineers had ever been diagnosed with, or undergone treatment for, gender identity disorder.

57.     On information and belief, Ms. Stacy's former job responsibilities were assumed by the following individuals after Ms. Stacy's termination: Mr. Radaker, Mike Savo, Bryon Stahley and Danielle Mackavage.

58.     On information and belief, none of the individuals who assumed Ms. Stacy's job duties was gender non-conforming or transsexual.

59.     On information and belief, none of the individuals who assumed Ms. Stacy's job duties had ever been diagnosed with, or undergone treatment for, gender identity disorder.

60.     As of January 15, 2008 – the date Ms. Stacy was first informed of her impending termination – all but one of the other individuals in Ms. Stacy's group who were slated for discharge had already obtained alternative employment with the assistance of the company or had informed management that they intended to voluntarily retire.

61.     As of the time of her termination, in 2008, Ms. Stacy's compensation still had not returned to the level of her pre-transition compensation in 2004.

62.     Since her termination, Plaintiff has continued to apply for positions with Defendants, including a position in Allentown (Customer Quality Engineer), which Ms. Stacy applied for in or around August 2008.

63.     Despite her outstanding qualifications, Ms. Stacy did not receive an offer of employment for the above-referenced positions. On information and belief, retaliation, gender identity, sex and/or disability-based bias against Ms. Stacy played a role in the refusal to hire her into the above-referenced positions.

## COUNT I
### (Title VII: Sex Discrimination)

64.     The allegations of paragraphs 1 through 63 are hereby incorporated by reference.

65.     Title VII prohibits discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a).  An employee who is discriminated against because of his or her gender is discriminated against on the basis of sex.

66.     Defendants terminated Ms. Stacy, and denied her the opportunity to transfer or be hired into another position, because she was perceived as a man whose gender presentation does not conform with male gender stereotypes.

67.     In addition, or in the alternative, Defendants terminated Ms. Stacy, and denied her the opportunity to transfer or be hired into another position, because she was perceived as a woman whose gender presentation does not conform with female gender stereotypes.

68.     In addition, or in the alternative, Defendants terminated Ms. Stacy, and denied her the opportunity to transfer or be hired into another position, because she changed her sex and became a woman.

69.     In addition, or in the alternative, Defendants terminated Ms. Stacy, and denied her the opportunity to transfer or be hired into another position because she is transsexual.

70.     The forgoing actions by Defendants were in violation of Title VII's prohibition on sex discrimination.

71.     Defendants' unlawful actions were done with malice or reckless indifference to Plaintiff's rights under Title VII.

## COUNT II
### (Title VII: Retaliation)

72.     The allegations of paragraphs 1 through 63 are hereby incorporated by reference.

73.     Title VII prohibits retaliation against any individual for opposing discrimination and/or making a charge or participating in proceedings under Title VII, *see* 42 U.S.C. § 2000e-3(a).

74.     Ms. Stacy, through counsel, contacted Jon Gibson, LSI's Vice President of Human Resources, by letter on or around April 21, 2008, to inform him that she intended to file charges of discrimination against the company, and seeking informal resolution.

75.     Ms. Stacy subsequently filed charges with the Pennsylvania Human Relations Commission (cross-filed with the EEOC) and with the Allentown Human Relations Commission in mid-May 2008.

76.     On information and belief, Defendants were notified of Ms. Stacy's charges in or around July 2008.

77.     On information and belief, Defendants denied Ms. Stacy the opportunity to be hired into another position because of her opposition to discriminatory practices and/or filing of a charge as set forth above.

78.     The forgoing actions by Defendants were in violation of Title VII's prohibition on retaliation.

79.     Defendants' unlawful actions were done with malice or reckless indifference to Plaintiff's rights under Title VII.

## COUNT III
### (Pennsylvania Human Relations Act: Sex Discrimination)

80.     The allegations of paragraphs 1 through 63 and 66 through 69 are hereby incorporated by reference.

81.     The Pennsylvania Human Relations Act ("PHRA") prohibits discrimination on the basis of sex.  43 P.S. § 955(a).  An employee who is discriminated against because of his or her gender is discriminated against on the basis of sex.

82.     Defendants' actions (set forth in the paragraphs incorporated by reference herein) were in violation of the PHRA's prohibition on sex discrimination.

## COUNT IV
### (Pennsylvania Human Relations Act: Disability Discrimination)

83.     The allegations of paragraphs 1 through 63 are hereby incorporated by reference.

84.     The PHRA prohibits discrimination on the basis of handicap or disability.  *See* 43 P.S. § 955(a).  "Handicap or disability" is defined by the Act as "(1) a physical or mental impairment which substantially limits one or more of [a] person's major life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment . . ." 43 P.S. § 954(p.1).

85.     Ms. Stacy is diagnosed with gender identity disorder, which is a "physical or mental impairment."

86.     This impairment, or the treatment therefore, caused substantial limitations in one or more of Ms. Stacy's major life activities, including but not limited to reproduction, sleeping, concentration, ability to interact with others, and certain types of physical activities.

87.     In addition, or in the alternative, Ms. Stacy was "regarded as" having a substantially limiting impairment.

88.     In addition, or in the alternative, Ms. Stacy had a "record" of having a substantially limiting impairment.

89.     Defendants terminated Ms. Stacy, and denied her the opportunity to transfer or be hired into another position because of her disability, and/or because she was "regarded as" disabled, and/or because she had a "record" of a disability.

90.     The forgoing actions by Defendants were in violation of the PHRA's prohibition on disability discrimination.

## COUNT V
### (Pennsylvania Human Relations Act: Retaliation)

91.     The allegations of paragraphs 1 through 63 and 74 through 77 are hereby incorporated by reference.

92.     The PHRA prohibits retaliation against any individual for opposing discrimination and/or making a charge or participating in proceedings under the Act, *see* 43 P.S. § 955(d).

93.     The Defendants' actions (set forth in the paragraphs incorporated by reference herein) were in violation of the PHRA's prohibition on retaliation.

## COUNT VI
### (Allentown Human Relations Act: Gender Identity Discrimination)

94.     The allegations of paragraphs 1 through 63 are hereby incorporated by reference.

95.     The Allentown Human Relations Act ("AHRA") prohibits discrimination on the basis of gender identity in employment, *see* AHRA, § 181.03.

96.     Defendants terminated Ms. Stacy, and denied her the opportunity to transfer or be hired into another position, because of her gender identity.

97.     The forgoing actions by Defendants were in violation of the AHRA's prohibition on gender identity discrimination.

## COUNT VII
### (Allentown Human Relations Act: Sex Discrimination)

98.     The allegations of paragraphs 1 through 63 and 66 through 69 are hereby incorporated by reference.

99.     The AHRA prohibits discrimination on the basis of sex in employment, *see* AHRA § 181.03.  An employee who is discriminated against because of his or her gender is discriminated against on the basis of sex.

100.    Defendants' actions (set forth in the paragraphs incorporated by reference herein) were in violation of the AHRA's prohibition on sex discrimination.

## COUNT VIII
### (Allentown Human Relations Act: Disability Discrimination)

101.    The allegations of paragraphs 1 through 63 and 85 through 89 are hereby incorporated by reference.

102.    The AHRA prohibits discrimination on the basis of disability in employment, *see* AHRA § 181.03.  "Disability" is defined by the Act as "a. Physical or mental impairment which substantially limits one or more of [a] person's major life activities; b. Record of such an impairment; or c. Regarded as having such an impairment . . ."  AHRA, § 181.02.

103.    Defendants' actions (set forth in the paragraphs incorporated by reference herein) were in violation of the AHRA's prohibition on disability discrimination.

**COUNT IV**
**(Allentown Human Relations Act: Retaliation)**

104.    The allegations of paragraphs 1 through 63 and 74 through 77 are hereby incorporated by reference.

105.    The AHRA prohibits retaliation against any individual for opposing discrimination and/or making a charge or participating in proceedings under the Act, *see* AHRA § 181.03.

106.    Defendants' actions (set forth in the paragraphs incorporated by reference herein) were in violation of the AHRA's prohibition on retaliation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following relief, including damages in excess of $150,000 (exclusive of interest and costs):

a.    Declaratory relief, including but not limited to a declaration that Defendants' actions violate Title VII, the Pennsylvania Human Relations Act and the Allentown Human Relations Act;

b.    Appropriate injunctive relief, including but not limited to reinstatement, and an order restraining Defendants from engaging in further discriminatory conduct of the types of which Plaintiff complains herein;

c.    Back pay;

d.    Front pay (in the alternative to reinstatement);

- 17 -

e.     Compensatory damages (including but not limited to damages for emotional pain

       and suffering);

f.     Punitive damages (Title VII only);

g.     Pre and post-judgment interest;

h.     Attorneys' fees and costs; and

i.     All such further relief as is permitted by law.


                              Respectfully submitted,


                        BY: _____
                              Katie R. Eyer - I.D. 200756
                              Scott B. Goldshaw - I.D. 85492
                              SALMANSON GOLDSHAW, P.C.
                              Two Penn Center
                              1500 J.F.K. Blvd., Suite 1230
                              Philadelphia, PA  19102
                              215-640-0593
                              215-640-0596 (fax)
Date:  September 14, 2010     *Attorneys for Plaintiff Janis Stacy*