IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

JANIS STACY,                        : CIVIL ACTION NO. 10-4693
                                    :
            Plaintiff               :
                                    :
                                    :
                                    :
      v                             :
                                    :
                                    :
                                    :
LSI CORPORATION, et al,             : Philadelphia, Pennsylvania
                                    : May 2, 2011
            Defendant               : 3:07 p.m.

- - -

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE EDUARDO C. ROBRENO
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiff:      KATIE R. EYER, ESQUIRE
                        Salmanson Goldshaw, PC
                        Two Penn Center
                        Suite 1230
                        1500 John F. Kennedy Blvd.
                        Philadelphia, PA  19102


For Defendant LSI:      ROBERT W. CAMERON, ESQUIRE
                        Littler Mendelson
                        Dominion Tower
                        26th Floor
                        623 Liberty Avenue
                        Pittsburgh, PA  15222


For Movant The          RYAN ALLEN HANCOCK, ESQUIRE
PA Human Relations      Pennsylvania Human
Commission:             Relations Commission
                        711 State Office Bldg.
                        1400 Spring Garden Street
                        Philadelphia, PA  19130


*Transcribers Limited*
17 Rickland Drive
Sewell, NJ 08080
856-589-6100 · 856-589-9005

2

1   Audio Operator:        Joseph Matkowski

2   Transcribed By:        Michael Keating

3                          - - -

4           Proceedings recorded by electronic sound
    recording; transcript produced by computer-aided
5   transcription service.

6                          - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          (The following was heard in open court at

2     3:07 p.m.)

3          THE COURT:  Defendant's motion to dismiss.

4     Why don't we hear from the defendant, and then we'll

5     hear from plaintiff and then we'll hear from the

6     Pennsylvania Human Relations Commission.

7          MR. CAMERON:  May I approach, Your Honor?

8          THE COURT:  Please.

9          MR. CAMERON:  Thank you very much.

10         (Pause in proceedings.)

11         MR. CAMERON:  Your Honor, Bob Cameron here on

12    behalf of LSI Corporation and Agere Systems, and our

13    motion to dismiss and for summary judgment is currently

14    before you.

15         Under the motion to dismiss, we believe that

16    our argument is clear, succinct, and short and to the

17    point.  And that is that the Pennsylvania Human

18    Relations Act does not recognize gender identity as a

19    covered handicap or disability.

20         We believe that that position has been

21    reviewed by two courts, one prior Eastern District

22    Court opinion in the Dobre case cited in our brief, as

23    well as the commonwealth court opinion of the

24    Pennsylvania Commonwealth Court, in which case both

25    courts found that gender identity disorder or

4

transsexualism is not covered, simply not covered by the act.

In support of their arguments, a couple things come to mind.  First, the Pennsylvania Human Relations Act was, and I don't think there's any dispute under the participants here today, was patterned after the Federal Rehabilitation Act, and its definition of "handicap" and "disability" is almost identical to the old Federal Rehab Act definition.

When the Americans With Disabilities Act was passed the Federal Rehab Act was amended shortly thereafter.  Both statutes recognized an express exclusion for, among other things, transsexualism, gender identity disorder.

One of the authorities that we have cited in our brief, Your Honor, recognize that that amendment to the Federal Rehab Act, in which the Pennsylvania Human Relations Act was patterned, was based on the original intent, which was that transsexualism and gender identity disorder was not intended to be covered by the act.

So, consequently, we believe that since the Pennsylvania Human Relations Act was patterned after the Federal Rehab Act.  The federal legislatures made clear that transsexualism and gender identity disorder

5

1   was never intended to be covered by Rehab Act, that,

2   consequently, it's not covered in this case as well.

3           The Eastern District of Pennsylvania in the

4   Dobre case in 1993 squarely addressed this issue held

5   the same way.

6           THE COURT:  Well, didn't it say in Dobre that

7   plaintiff did not allege in the complaint that she

8   suffers from any organic disorder of the body, did not

9   allege that her major life activities were impaired

10  and, therefore, could not sustain a claim for either

11  physical or mental disability?

12          MR. CAMERON:  They did, Your Honor.  They

13  also said in that case recognizing that the

14  Pennsylvania Human Relations Act is patterned after the

15  Rehab Act, and since the Rehab Act was never intended

16  to cover transsexualism or gender identity disorder as

17  a disability that, therefore, it's not covered.  It's

18  not part of the Act, not entitled to the protection.

19          So that's my interpretation of the Dobre

20  case.  That's our client's interpretation of the Dobre

21  case.  Similarly, the Holt case in 1997 when the

22  commonwealth court addressed that issue, and Dobre was

23  a motion to dismiss case, Holt was preliminary

24  objections also, you know, not enough in complaint to

25  establish a claim.

6

THE COURT:  Well, that's what he says in
Holt, plaintiff does not allege that transsexualism
affects any bodily function or limits her major life
activities.  Doesn't that mean that this is an
insufficient pleading?

MR. CAMERON:  Well, I do think that there is
part of that in the Holt case just as there's part of
that in the Dobre case.  But I also believe that both
cases stand on the proposition that the legislature
never intended for transsexualism, gender identity
disorder, to be covered.  Okay.

THE COURT:  Well, aren't you putting sort of
the rabbit in the hat?  I think the question isn't,
perhaps, not what you call it, but the question is does
it meet the definition of handicap or disability?

That is, has the plaintiff alleged a physical
or mental impairment, A, and B, which substantially
limits one or more major life activities?  If the
answer to those questions is yes, then you have a
handicap or disability.

Now, you can call it whatever you want to
call it, but your approach is different.  Your approach
is no matter what the answer to this question is, if
you call it a certain thing, then it's not cognizable
under the Pennsylvania Statute.

7

        MR. CAMERON:  That is --

        THE COURT:  And no matter what --

        MR. CAMERON:  That is how --

        THE COURT:  No matter whether or not they
meet the definition of "handicap" or "disability."

        MR. CAMERON:  Correct, that's how we
interpret the Pennsylvania Human Relations Act
patterned after the Federal Rehabilitation Act.

        THE COURT:  Now, tell me again the sequence
of events.  You said patterned after.

        MR. CAMERON:  Yes.

        THE COURT:  What came first?  The
Rehabilitation Act?

        MR. CAMERON:  The Rehabilitation Act came
first, then the Pennsylvania Human Relations Act
adopted handicap or disability as a covered, protected
characteristic.

        THE COURT:  Right.

        MR. CAMERON:  Then when the Pennsylvania
Human Relations Act first accepted that handicap or
disability would be covered they didn't define
"handicap" or "disability."

        The Pennsylvania Human Relations Commission,
through its regulations, then gave a definition that
was also analogous, almost identical to the Federal

1  Rehab Act's definition of "handicap" or "disability."

2       Then, in 1990, the Americans With

3  Disabilities Act is passed, and that has an express

4  exclusion for transsexualism, gender identity disorder,

5  and other express exclusions not covered by the ADA.

6       And after that, the Federal Rehab Act is

7  amended to reflect that they never intended to cover

8  those classifications that were expressly excluded by

9  the ADA.   That happens in '91 or '92.

10       THE COURT:  If the amendment came after the

11  adoption in Pennsylvania of the Rehabilitation Act, it

12  could be said that the pennsylvania enactment adopted

13  something that hadn't yet been adopted by Congress.

14       MR. CAMERON:  Oh, I understand.  I'm not

15  going to say this is a clear cut one way or another.

16       THE COURT:  Okay.

17       MR. CAMERON:  I don't think either side is

18  completely right or either side is completely wrong

19  here.  I think what happened was the Pennsylvania Human

20  Relations Act and the Pennsylvania legislature adopted

21  the Federal Rehab Act.  Nobody really at the time new

22  fully what it was intended to encompass.

23       Then the feds, through the Rehab Act

24  amendment and the ADA made --

25       THE COURT:  In '91 or '92?

9

MR. CAMERON:  Exactly.  '90 and '91

THE COURT:  Yes.

MR. CAMERON:  Made clear we never intended,
among others, transsexualism and gender identity
disorder to be covered.  After that the '93 case was
the <u>Dobre</u> case, the first case interpreting under
Pennsylvania law whether or not transsexualism, gender
identity disorder is covered by the act.  Then, in '97,
commonwealth court says it's also not covered.

At that point in time, it would be our
position if those decisions are wrong, and we recognize
they're not binding authority on this Court, but
they're certainly persuasive.  They're the only two
Pennsylvania courts addressing this statute.

Then at that point in time either the
legislature needs to act, Pennsylvania Human Relations
Commission needs to act through a rule making or
clarification or something.  There's been no change to
those interpretations since the Rehab Act was amended,
the ADA was enacted, and then the two decisions.

THE COURT:  What about the Pennsylvania
Supreme Court's decision I think it's in <u>Civil Service
Commission</u> case, and --

MR. CAMERON:  Right.

THE COURT:  -- the methodology that it used

10

1   to answer these questions?

2       MR. CAMERON:  Yeah, and, again, in that case

3   they found that obesity was not a covered disability.

4   Now, the Supreme Court was presented with, because they

5   already had before them, a prior evidentiary hearing

6   before the Human Relations Commission and then before

7   the trial court and an appellate court.  They already

8   had a record, so they did not squarely decide one way

9   or another whether, per se, obesity is covered or it's

10  not covered.

11      THE COURT:  Yes.

12      MR. CAMERON:  They said based on the record

13  we have, plain --

14      THE COURT:  Yes, they in a sense --

15      MR. CAMERON:  -- plaintiff has established.--

16      THE COURT:  Well, my point is does that

17  suggest perhaps a methodology as to how you answer a

18  plaintiff who claims an impairment, and rather than

19  have a list of impairments, what you do is you

20  factually determine whether or not, as I indicated

21  under the statute, depending on the circumstances of

22  that case, whether or not there's a physical or mental

23  impairment.  There's none here.

24      MR. CAMERON:  Right.

25      THE COURT:  And number two, does it limit one

11

1  or more major life functions?  If it doesn't, then I

2  don't care what you call it, then you don't have a

3  disability.  If you fit into those categories, you have

4  a disability.

5          MR. CAMERON:  Right.  And that's a great

6  question that, unfortunately, we don't have an answer

7  to because --

8          THE COURT:  Okay.

9          MR. CAMERON:  -- they weren't presented with

10  the square issue of is obesity covered or isn't it

11  covered.

12          THE COURT:  Right.  Right.

13          MR. CAMERON:  They already had a full record,

14  and, you know, they weren't reviewing it de novo.  They

15  were just looking at the record and seeing if it was

16  there.

17          THE COURT:  What did the courts do below

18  there as the case worked its way through the Supreme

19  Court?  Was there a trial on the Civil Service

20  Commission?

21          MR. CAMERON:  Well, if my recollection is

22  correct, and I have the case back there, but not off

23  the top of my head, there was a Human Relations

24  Commission determination that he was covered by the Act

25  and there had been discrimination.

FORM 2094   ®   PENGAD • 1-800-631-6989 • www.pengad.com

12

1          THE COURT:  Right.

2          MR. CAMERON:  And I believe it was that way

3    all the way up until the Supreme Court overturned the

4    decision.

5          THE COURT:  Now, from the Human Relations

6    Commission do you go to the court of common pleas of

7    that county?

8          MR. CAMERON:  Yes.

9          THE COURT:  Yes, okay.

10          MR. CAMERON:  Yes.

11          THE COURT:  And then you go to the

12    commonwealth court?

13          MR. CAMERON:  Correct.

14          THE COURT:  Okay.  Very good.

15          MR. CAMERON:  So that --

16          THE COURT:  Okay.  Well, thank you.

17          MR. CAMERON:  That --

18          THE COURT:  Unless you have something else,

19    let me just hear what their --

20          MR. CAMERON:  Well, I wanted to also address

21    I mean --

22          THE COURT:  Oh, the Allentown situation.

23          MR. CAMERON:  Exactly.  Yes, and, you know,

24    two things on this.  First, on the local ordinance

25    coverage --

1    THE COURT:  Yes, does that add anything to

2  it?  I mean is it possible that you could have violated

3  one and not the other?

4    MR. CAMERON:  Well, I think that the scheme

5  is the same.  I mean I think that the McDonald Douglas

6  burden shifting scheme applies.

7    THE COURT:  Right.

8    MR. CAMERON:  The real issue is whether you

9  have an additional protection, and I think under the --

10    THE COURT:  Like what?

11    MR. CAMERON:  Well, under the Allentown Human

12  Rights Act --

13    THE COURT:  Right.

14    MR. CAMERON:  -- gender identity is already a

15  protected classification, okay?

16    THE COURT:  Above and beyond whatever the

17  statute --

18    MR. CAMERON:  Above and --

19    THE COURT:  -- the state statute says.

20    MR. CAMERON:  Unlike in the Pennsylvania

21  Human Relations Act, it is expressly set forth in the

22  local code.

23    THE COURT:  Do they have authority to do

24  that?

25    MR. CAMERON:  They do.

FORM 2094   ® PENGAD · 1-800-631-6989 · www.pengad.com

14

1          THE COURT:  Okay.

2          MR. CAMERON:  Under their home rule of

3    charter, they do.

4          THE COURT:  Okay.

5          MR. CAMERON:  Okay?  What they don't have the

6    authority to do is extend over into Hanover Township,

7    which is where Ms. Stacy was employed from 2002 through

8    the end of her employment.

9          THE COURT:  Okay.  So they have authority

10   to -- I mean assuming that we were going to go down a

11   category of -- I mean even if they had authority to do

12   that, they still would have to meet the disability test

13   though.

14         MR. CAMERON:  They would.  They would.  It's

15   really our argument.  And a point I want to make is

16   we're not saying that Ms. Stacy does not have some

17   protection under the statute.  She does.

18         We're not in any way arguing that she doesn't

19   potentially have a claim if she can establish all the

20   elements for gender discrimination, or under the

21   Allentown statute that she may have a claim for gender

22   discrimination and she may have a claim for gender

23   identity disorder.  What we're arguing is --

24         THE COURT:  Well, what is the difference

25   between gender discrimination and gender identity

15

1   disorder?  Wouldn't one fit under the other?

2          MR. CAMERON:  Well, I mean probably under the

3   Third Circuit's decision in the <u>Wise Business Forms</u>

4   case from a couple years ago, one of Ms. Eyer's cases,

5   you could probably read them together.

6          I mean in that case, the Third Circuit made

7   clear that discrimination against somebody based on,

8   you know, sexual orientation or gender identity is

9   prohibited gender discrimination.  But Allentown has

10  that additional --

11         THE COURT:  That was a decision on

12  interpreting what statute?

13         MR. CAMERON:  That was interpreting Title

14  VII.

15         THE COURT:  Okay.

16         MR. CAMERON:  Right, not the ADA.  Right.

17         THE COURT:  So the issue in Allentown is

18  what?

19         MR. CAMERON:  We have two issues in

20  Allentown.  First, we're arguing that Ms. Stacy already

21  is covered under, you know, the prohibition against sex

22  discrimination and against gender identity

23  discrimination.

24         But we make the same argument we make before

25  the Pennsylvania Human Relations Act argument, that

16

1   transsexualism, gender identity disorder, is not a

2   covered disability under the Allentown Human Rights Act

3   either, and as further support for that, Allentown put

4   the express protection in there for gender identity

5   discrimination.

6         THE COURT:  But in terms of this geography

7   situation --

8         MR. CAMERON:  Right.

9         THE COURT:  -- what is the issue there?

10        MR. CAMERON:  Well, the issue I guess is

11   where was she employed because --

12        THE COURT:  There are two locations.

13        MR. CAMERON:  Right.

14        THE COURT:  One in Allentown at American

15   Parkway and the other one at Union Boulevard.

16        MR. CAMERON:  Right.  And from the middle of

17   2002 through the end of her employment, 2008, Ms. Stacy

18   was employed in Hanover Township --

19        THE COURT:  And she was --

20        MR. CAMERON:  -- not in Allentown.

21        THE COURT:  -- in neither one of these

22   locations?

23        MR. CAMERON:  She was employed at the

24   American Parkway location, which is located in Hanover

25   Township, which is next to Allentown, but it is not

1  Allentown.

2          THE COURT:  Well, it seems --

3          MR. CAMERON:  It's a separate --

4          THE COURT:  It seems to have an address in

5  Allentown.  I don't know what that means.

6          MR. CAMERON:  It's the post office.  They

7  share a post office.

8          THE COURT:  1110 Parkway Northeast Allentown,

9  PA 18109 is within the --

10          MR. CAMERON:  That's within Hanover Township,

11  Pennsylvania.

12          THE COURT:  Hanover Township.

13          MR. CAMERON:  Correct.

14          THE COURT:  Okay.

15          MR. CAMERON:  And I recognize that

16  plaintiff's counsel has asked through their response to

17  take some discovery on this production of deed or

18  whatever.  If we need to go down that road, we're happy

19  to provide that evidence to them.

20          THE COURT:  So if she worked at both places,

21  what would be the answer to that?

22          MR. CAMERON:  We believe the answer is where

23  she is primarily employed, Your Honor, and she had been

24  primarily employed since the middle of --

25          THE COURT:  You mean in terms of time, you

1   tried to count out the days using one location as

2   opposed to the other?

3            MR. CAMERON:  She was overwhelmingly more

4   employed at the Hanover Township location.

5            THE COURT:  What type of work did she do, by

6   the way?

7            MR. CAMERON:  Excuse me?

8            THE COURT:  What type of work did she do?

9            MR. CAMERON:  I'm not sure what her specific

10  job was, but it would have been something related to

11  their business, which is semi-conductor manufacturing.

12           THE COURT:  Okay.  Okay, very good.

13           MR. CAMERON:  Thank you.

14           THE COURT:  Let me hear from plaintiff's

15  counsel and we'll give you a chance to reply again.

16           MR. CAMERON:  Thank you very much.

17           (Pause in proceedings.)

18           MS. EYER:  Good afternoon, Your Honor.  My

19  name is Katie Eyer and I represent the plaintiff, Janis

20  Stacy.

21           THE COURT:  Yes.

22           MS. EYER:  I would like to begin by

23  addressing the defendant's motion to dismiss Ms.

24  Stacy's disability discrimination claims.

25           As Mr. Cameron stated in his argument, the

1  crux of the defendant's motion to dismiss is that this

2  Court should carve out a categorical exclusion for

3  gender identity disorders from the plain language of

4  the Pennsylvania Human Relations Act.  This approach is

5  impermissible for three independent reasons.

6        First, it contradicts the plain language of

7  the act.  Second, it is contrary to the reasoned views

8  of the Pennsylvania Human Relations Commission, which

9  would be afforded deference by the state courts and are

10 entitled to deference from this Court.  And, finally,

11 it is contrary to the legislative history of the act

12 and standard canons of statutory construction.

13        I'd like to start with that last point

14 because that was one on which Mr. Cameron spent quite a

15 bit of time.  The relevant history here is, as Mr.

16 Cameron stated, that the Federal Rehabilitation Act was

17 enacted with the three part definition of "disability,"

18 which is substantially identical to the definition of

19 "disability" that Pennsylvania has here today.  That

20 definition was consistently construed as including

21 gender identity disorders.

22        In 1990, at the time that the ADA was being

23 debated, an express exclusion was added both to the ADA

24 and to the Federal Rehabilitation Act, and very shortly

25 thereafter, the Pennsylvania legislature for the very

20

1   first time adopted a statutory definition of

2   "disability" for the Pennsylvania Human Relations Act.

3          In adopting a definition, they included some

4   of the exclusions that exist under federal law.  So,

5   for example, the exclusion for illegal drug abuse has

6   been incorporated in the Pennsylvania definition of

7   "disability."  That is not considered a disability

8   under state law, just as it is not under federal law.

9          But they specifically did not include the

10  pertinent language on gender identity disorders.  So I

11  think that this is very powerful indication that the

12  legislature did not intend a categorical exclusion.

13  They certainly --

14          THE COURT:  But do you have to show it

15  substantially limits one or more major life activities?

16          MS. EYER:  Certainly as to the first prong of

17  the definition of "disability," we would have to

18  demonstrate that.  We have pled in our complaint that

19  Ms. Stacy was substantially limited in several major

20  life activities.

21          And, as Your Honor averted to, this is a

22  significant difference between the two cases that the

23  defendant has cited on this matter, Dobre and Holt,

24  versus this case.  In both of those cases, the

25  plaintiff there had not pled a substantial limitation

1 of a major life activity.

2       I believe in the <u>Holt</u> case, they also have
3 not plead physical or mental impairment.  Whereas,
4 here, Ms. Stacy has fully pled all of the required
5 elements of a disability claim.  And it is only by
6 arguing that an exclusion should be read into the law
7 that one could grant a motion to dismiss.

8       THE COURT:  Well, I'll go back to the point
9 that I raised with Mr. Cameron, whether the question
10 that the Court has to afford is not whether gender
11 identity is a covered disability, but whether or not
12 the plaintiff has alleged a physical or mental
13 impairment which substantially limits one or more life
14 activities and a record of having such an impairment.

15       Now, what you call it is not, at least at
16 this point, important.  There's no list of categories
17 one way or the other.

18       MS. EYER:  That's absolutely --

19       THE COURT:  I mean you can call it something
20 else.  I don't know.  But if this is a term that is --
21 that is recognized in the literature as a -- I think
22 there was a citation to the <u>Deanforth</u> (ph).

23       MS. EYER:  That's absolutely correct, Your
24 Honor.

25       THE COURT:  Yes.

1    MS. EYER:  And I would say that we absolutely

2  agree.  Our position is precisely that Ms. Stacy'

3  disability must be considered on a case by case basis

4  under the language of the "disability" definition.  And

5  that is precisely our argument here today, that she

6  can't be excluded simply because of her disorder.

7    THE COURT:  Well, under <u>Civil Service</u>

8  <u>Commission</u>, you could have a case where a person who

9  has been maybe diagnosed as obese would be able to show

10  physical or mental impairment which substantially

11  limited one or more major activities and had a record

12  of such impairment, and that would be recognized as a

13  disability.

14    MS. EYER:  That's correct.  And if you take a

15  look at the <u>Civil Service Commission</u> decision, they

16  specifically reserve that issue in a footnote.  They

17  say we're deciding that on the evidence here there was

18  not adequate evidence to make out a statutory

19  disability, but we reserve the issue of whether obesity

20  may form a disability on other facts and circumstances.

21    THE COURT:  Yes.

22    MS. EYER:  And this is the standard approach

23  that is applied under the State Disability

24  Discrimination Law to address each case on its facts

25  and circumstances to see whether or not an actionable

1 disability exists.

2       THE COURT:  How about the Allentown

3 situation?  What do we do about that?

4       MS. EYER:  In terms of the motion for summary

5 judgment?

6       THE COURT:  Yes.

7       MS. EYER:  Yes.

8       THE COURT:  Well, yes, I guess what is the

9 factual dispute here?

10       MS. EYER:  The factual dispute here is as

11 to -- there's both a factual dispute and a legal

12 dispute.  The factual dispute is as to the location of

13 the 1110 American Parkway Northeast facility.

14       We've submitted evidence in connection with

15 our brief that we believe raises a genuine issue of

16 fact as to whether it is located within Allentown,

17 including, for example, the county maps that show that

18 the entirety of the American Parkway never enters

19 Hanover Township.  It is exclusively within Allentown.

20       We also believe that this would be an

21 appropriate case for Rule 56(d), formerly Rule 56(f)

22 ruling, given that we have not had the opportunity to

23 conduct discovery.

24       For example, we found online a deed that we

25 believe to be the deed to the property that shows that

24

1   it falls partially within Allentown, but we have been

2   unable to authenticate that because we have not had the

3   opportunity yet for discovery.

4           So on either of those bases --

5           THE COURT:  Did you file an affidavit, by the

6   way, on --

7           MS. EYER:  I did file an affidavit.

8           THE COURT:  -- 56(f) --

9           MS. EYER:  Yes.

10          THE COURT:  -- asking for this information?

11          MS. EYER:  I did.  It's attached to our

12   principal brief.

13          THE COURT:  Okay.  Go ahead.

14          MS. EYER:  Finally, as to the legal dispute,

15   you know, Ms. Stacy did work part-time at what nobody

16   disputes is an Allentown address.  That's the 555 Union

17   Boulevard address, and she also applied for positions

18   there at the time of her termination.  Both of those

19   are contacts that courts have routinely found to be

20   sufficient to confer --

21          THE COURT:  Well, let's assume that the

22   Hanover Township situation is resolved in your favor.

23   Ultimately, if there is liability here, does it make

24   any difference as to whether it is under the Allentown

25   Human Relations statute or the state statute?

25

1   MS. EYER:  As Mr. Cameron adverted to, there

2   is one additional protected class under Allentown law,

3   and that is gender identity is covered separately, not

4   as a -- it's covered both as a disability under

5   Allentown law but then also as a separate

6   classification.

7   At this point, we're pre-discovery, so, you

8   know, I think we have a good faith basis for believing

9   that there are multiple potential bases for the claim

10   here.

11   THE COURT:  What would that be if it's a

12   separate qualif -- I mean I guess we've disposed pretty

13   well of the state claim, but explain to me then how you

14   would analyze the case, assuming that it is covered by

15   the --

16   MS. EYER:  Allentown law.

17   THE COURT:  -- Allentown law.

18   MS. EYER:  Just let me get the language of

19   the Allentown law.

20   THE COURT:  Yes.

21   MS. EYER:  So Allentown law, in addition to

22   covering sex and disability, which plaintiff has claims

23   under, also has a separate class for gender identity,

24   which is defined in the act as "Self-perception or

25   perception by others as male or female, including a

1  person's appearance, behavior, or physical

2  characteristics that may be in accord with or opposed

3  to one's physical anatomy, chromosomal sex, or sex

4  assigned at birth."

5          So it has a somewhat different definition.

6  So, for example, there's a possibility that a jury

7  might conclude that Ms. Stacy does not meet the

8  definition of disability, but that she does fall within

9  this gender identity definition.  So that's what's the

10  difference in proceeding under Allentown law as opposed

11  to under the state law.

12          THE COURT:  And what would she be entitled to

13  by way of damages under the Allentown statute?

14          MS. EYER:  I believe the remedies under the

15  Allentown law are the same as under state law.

16          THE COURT:  It should be compensatory and

17  punitive damages?

18          MS. EYER:  There are no punitive damages

19  permitted under state law, and I believe that the same

20  is true under Allentown law, though I'm not sure off

21  the top of my head.

22          THE COURT:  Okay.

23          MS. EYER:  Your Honor mentioned the issue of

24  whether Allentown had the authority to enact this law.

25          THE COURT:  Right.

1    MS. EYER:  There's actually one of the cases

2  cited in the brief, <u>Hartman versus City of Allentown</u>

3  resolved that very issue in the affirmative saying that

4  localities can enact these types of laws, they can

5  include classes that are not addressed under state

6  law.

7    THE COURT:  That's a Pennsylvania Supreme

8  Court decision?

9    MS. EYER:  It's a commonwealth court decision

10  but based on a Supreme Court ruling in another case

11  that's actually cited in the briefs.

12    THE COURT:  Under the local rule --

13    MS. EYER:  Their home rule authority --

14    THE COURT:  Home rule authority.

15    MS. EYER:  -- under the police power gives

16  them the authority to enact these types of laws.

17    And a final point that I just wanted to note

18  in relation to the <u>Hartman</u> decision, in that case, we

19  had precisely the circumstance of the PHRC expressing

20  their view of the Pennsylvania Human Relations Act in

21  an amicus brief.

22    The commonwealth court afforded that view

23  substantial deference, and that is, you know -- the

24  Third Circuit has made clear that the federal courts

25  should do the same where the views of the agency would

28

1   otherwise be afforded deference under state law.

2          THE COURT:  But not as to Allentown Human

3   Relations -- does Allentown has a Human Relations

4   Commission?

5          MS. EYER:  It does have a Human Relations

6   Commission.

7          THE COURT:  Okay.

8          MS. EYER:  We did not ask that they

9   participate as amicus in this case, given that the

10  Allentown issue is much more focused on the location

11  issue, which is a dispute of fact.

12         And I will note the defendant also does make

13  a separate argument in relation to Allentown law that

14  Ms. Stacy can't be covered under both the disability

15  prong and the gender identity prong.  That's simply not

16  the case.

17         There are overlapping coverages for numerous

18  classifications under the Allentown law, such as color

19  and race or national origin and place of birth.  So

20  there's no reason to believe that the commission

21  intended that claimants could only prove claims under

22  one particular classification.

23         THE COURT:  Yes.  Okay, very good.  Thank

24  you.

25         MS. EYER:  Thank you.

1          THE COURT:  Human Relations Commission,

2    sitting there by yourself.

3          MR. HANCOCK:  It's lonely over here, Your

4    Honor.

5          THE COURT:  Okay.  You are Mr. Hancock?

6          MR. HANCOCK:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. HANCOCK:  My name is Ryan Allen Hancock

9    and I'm representing the Pennsylvania Human Relations

10   Commission today.

11         Your Honor, gender identity disorder is not

12   statutorily or categorically, as a matter of law,

13   excluded from consideration of a disability for three

14   main reasons.

15         THE COURT:  Or included.

16         MR. HANCOCK:  It is not excluded from

17   consideration as a disability --

18         THE COURT:  Right.

19         MR. HANCOCK:  -- for three principal reasons.

20   One is that the gender identity is -- gender identity

21   disorder is not specifically or expressly excluded

22   under the plain language of the act.

23         Two, the Pennsylvania general assembly did

24   not intend to exclude gender identity from this

25   coverage.

30

And, three, impairments must be reviewed on a
case by case basis in order to determine if that
impairment is a disability under the law.

For example, a person or an individual
alleging gender identity dis -- gender identity
disorder, claiming protection under the act, must
allege that he or she has been aggrieved by an
unlawful, discriminatory practice based upon that
alleged disability, and offer factual evidence that his
or her impairment meets that three prong statutory
definition under the act.

And any other statutory interpretation would
wholly frustrate the Pennsylvania general assembly's
intent to foster the employment of all individuals in
their fullest capacities regardless of their protected
class.

Your Honor, if you review the act as well as
the regulations, one will note that gender identity
disorder is not expressly excluded under that act.   In
fact, the only express exclusion with regard to
handicap or disability relates to the controlled use or
addiction to a controlled substance.

So, Your Honor, even if the Pennsylvania
Supreme Court would look beyond the plain language,
there is no evidence that the general assembly intended

31

1   to exclude gender identity disorder from coverage.

2          Further, all other textual evidence supports

3   the commission's position that impairments must be

4   reviewed on a case by case basis -- basis in order to

5   determine if that impairment is a disability under the

6   act.

7          Finally, Your Honor, I would have to say --

8   or it is the Commission's position that this Court

9   should, as the Pennsylvania Supreme Court would, give

10  the Commission's interpretation of the act substantial

11  weight in this matter, as we have here today.  Thank

12  you.

13         THE COURT:  Okay.  Very good.  Okay.  Mr,

14  Cameron, a brief --

15         MR. CAMERON:  Just very briefly, Your Honor.

16         THE COURT:  -- reply if you wish.

17         MR. CAMERON:  Just very briefly.  Thank you.

18  My only point is with all due respect to the

19  Pennsylvania Human Relations Commission, there have

20  been two interpretations of the statute, one by the

21  Eastern District of Pennsylvania, one by the

22  Commonwealth Court of Pennsylvania, both dating back to

23  1993 and 1997.

24         If those cases were decided wrongly, if those

25  cases were decided incorrectly, where is the

1  clarification, where are the regulations, where is the

2  guidance?  Okay.  We may not be here today if we had

3  that.

4         All right.  So our position is, again, just

5  to summarize real quickly, the Federal Rehab Act is the

6  applicable authority on which the Pennsylvania

7  legislature adopted the Pennsylvania Human Relations

8  Act.

9         The Federal Rehab Act was amended to make

10 clear that it was never intended to cover

11 transsexualism and gender identity disorder for the

12 same reason the Pennsylvania Human Relations Act should

13 be interpreted the same way as it has in two prior

14 decisions that are non-binding, but precedential -- or

15 I'm sorry -- but persuasive.  Thank you, Your Honor.

16       THE COURT:  Okay.  Thank you.  Well, I

17 think everything has been said, even if it hasn't been

18 said by everybody.  But I think it's been a very

19 engaging and well-prepared.  I commend counsel.  You've

20 been very, very helpful.

21       But I think I'm ready to rule in this matter.

22 And let me first address the motion to dismiss the

23 gender identity disorder under the Pennsylvania Human

24 Relations Act.

25       As to the methodology, I'm going to rely upon

33

1    the decision of the Pennsylvania Supreme Court and

2    Civil Service Commission where the Pennsylvania Supreme

3    Court found that the plaintiff had not alleged a prima

4    facia claim for disability based on obesity.

5        It did so, however, after considering at

6    length the facts of that case, including the weight and

7    life activities which the plaintiff in that case had

8    engaged in.

9        After a thorough review of the record, the

10   Supreme Court found that in that case the plaintiff

11   had not prevailed showing that obesity was a

12   disability.

13       With that framework in mind, I turn to the

14   allegations that have been made in this complaint.  And

15   I find that looking at the definition of "handicap" or

16   "disability" in the Pennsylvania Human Relations Act,

17   the plaintiff has sufficiently alleged a physical or

18   mental impairment which substantially limits one or

19   more major life activities, and a record of having such

20   impairment.  That being so, the allegations in the

21   complaint appear to satisfy the definition under the

22   Pennsylvania Human Relations Act.

23       I will distinguish both the interpretations

24   that counsel relies on in Dobre versus Amtrak and the

25   Holt case, a decision by this court, Judge Hutton, in

34

1  1993, and a decision of the commonwealth court in 1997.

2      Both cases appear to focus on the allegations

3  of the complaint and properly identified that the

4  plaintiff had failed to allege the very requirements of

5  the Pennsylvania Human Relations Act.

6      That is he had failed to allege a physical or

7  mental impairment which substantially limited a major

8  life activity.  Therefore, Dobre and Holt are not

9  helpful in this case.

10     Under those circumstances, it just seems to

11 me that what we need to do is to proceed to the

12 relevant record in this case, and based upon that

13 record, we can then contrast the actual record to the

14 definition of the Pennsylvania Human Relations Act and

15 see whether or not on the record and on the facts of

16 this case plaintiff meets the definition of

17 "disability."

18     Given that this is a motion to dismiss, we

19 accept as true the well pleaded allegations of the

20 complaint and we draw all reasonable inferences in

21 favor of the plaintiff.  Given the standard to be

22 applied and the allegations of the complaint, the

23 motion to dismiss will be denied.

24     As far as the motion for summary judgment is

25 concerned, I'm going to deny that motion instead of

1  granting the plaintiff an opportunity to simply reply

2  to it.

3          I think the most economical way of doing this

4  is just to allow discovery to proceed.  So the motion

5  for summary judgment will be denied without prejudice

6  and it may be reasserted at the completion of discovery

7  once the parties have had an opportunity to address

8  with specificity, the question that has burdened the

9  legal world for years, whether 1110 American Parkway is

10  in Allentown or in the Township of Hanover.

11          So I will let you try to figure that one out

12  and come back to me.  So I think what we need to do is

13  setup a reasonable period of time to do discovery on

14  both of these matters.  Ms. Eyre, what do you have in

15  mind?

16          MS. EYER:  We did not confer with the

17  defendant yet on the length of discovery.  I would

18  imagine standard, you know, six months.  I don't know

19  if that --

20          THE COURT:  Yes.  Did you have a 26(f)

21  conference as to --

22          MR. CAMERON:  We haven't yet because of this

23  motion, and --

24          THE COURT:  Okay, fine.

25          MR. CAMERON:  -- if Your Honor would like, we

36

1   can consult and get back to you within a week.

2         THE COURT:   Okay.   Well, why don't I do this?

3   I'll do this on broad strokes now so that we can get

4   started and we can have a hundred and eighty days to

5   take discovery and file motions for summary judgment at

6   that time.   So you have a hundred and eighty days to do

7   all this work and be prepared to file motions at that

8   point.

9         What I will do is then set the case for trial

10  thirty days thereafter, which really means that if the

11  motion has not been decided, it will be thirty days, if

12  a trial is warranted after the motion for summary

13  judgment is decided.

14        But for scheduling purposes we would like to

15  set a trial date.   And the trial date will be thirty

16  days after the completion of discovery or summary

17  judgment or when summary judgment is decided.   So you

18  got to be prepared to do that.

19        Once you meet, I'd like you to submit a 26(f)

20  report and if there is some drastic amendments, I will

21  get you on the phone and we'll discuss them.   If they

22  are not much to change and both parties agree, I'll

23  likely to go along with your suggestions, and you know

24  the case best.

25        So, that's where we are.   As far as ADR is

1   concerned, the protocol that I followed goes this way.

2   First, the parties should take some discovery so that

3   they are confident that they have a handle on the facts

4   before they sit down to discuss a possible resolution

5   of the case.

6          But probably sixty to ninety days out we

7   could have a conference with the magistrate judge,

8   Magistrate Judge Rueter, to see where you are in the

9   case.

10         My approach is that no one has an obligation

11  to agree to anything, but there is an obligation to at

12  least discuss the matter, and be sure that your clients

13  understand the alternatives available and some

14  preliminary evaluation of where you are.

15         If, at that time, you think you are not yet

16  ready to engage in a settlement conference, that's

17  fine, just let us know.  Nobody wants to waste time

18  and, you know, have everybody come here.

19         But my recommendation would be that it's

20  generally helpful to hear what the magistrate judge

21  has to say and to explore each other's position as

22  well.

23         So that's the marching, you know, marching

24  orders in this case.  So if there is a discovery issue,

25  the proper way to do that is file a motion.  And I will

38

1   then get you on the telephone and we'll try to sort

2   that out promptly so that it will not delay the

3   progress in the case.

4          So anything else then?  Ms. Eyre, anything

5   from you?

6          MS. EYER:  No, Your Honor.

7          THE COURT:  Mr. Cameron?

8          MR. CAMERON:  No, Your Honor.

9          THE COURT:  Mr. Hancock, thank you for coming

10  in.

11         MR. HANCOCK:  Thank you, Your Honor.

12         THE COURT:  Okay.  We'll adjourn now.  Thank

13  you.

14         (Proceedings adjourned, 3:47 p.m.)

15                    * * *

## CERTIFICATION

I, Matthew Tilghman, do hereby certify that the foregoing is a true and correct transcript from the electronic sound recordings of the proceedings in the above-captioned matter.

8-9-11
_____
Date

*Michael Keating*
Michael Keating