```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANIS STACY,                          :     CIVIL ACTION
                                      :     NO. 10-4693
          Plaintiff,                  :
                                      :
     v.                               :
                                      :
LSI CORPORATION and                   :
AGERE SYSTEMS, INC.,                  :
                                      :
          Defendants.                 :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              SEPTEMBER 12, 2012

Janis Stacy ("Plaintiff") brings this employment discrimination action against her former employer, Agere Systems, Inc., and its parent company, LSI Corporation (collectively, "Defendants"). Plaintiff moves for partial summary judgment on whether the Allentown Human Relations Act applies in this case. Defendants move for summary judgment on all of Plaintiff's claims of unlawful discrimination. For the reasons set forth below, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment as moot.

I.   **BACKGROUND**[1]

In 1998, Lucent Technologies, which later became Agere Systems, hired Plaintiff. Stacy Decl. ¶ 2. When she was hired, Plaintiff had a traditional masculine appearance, wore male clothing, and went by the name "Jim." Id. ¶ 3. In 2002, however, Plaintiff was diagnosed with gender identity disorder ("GID"). Id. ¶ 4. Following her diagnosis with GID, Plaintiff underwent psychological counseling and began receiving hormone therapy. Id. ¶ 5.

In February 2005, Plaintiff revealed to Agere Human Resources Business Partner Christine Sostarecz that she suffered from GID and would be transitioning from male to female. Stacy Dep. 104:24-11, Sept. 13, 2011. Sostarecz educated herself about GID and worked with Plaintiff to prepare a presentation to her coworkers regarding her gender transition. Sostarecz Dep. 51:5-56:24, Oct. 26, 2011. In March 2005, Plaintiff made a presentation to her coworkers, including her manager, Dave Sotak, and the director of her current workgroup, George Stasak. Stacy Dep. 110:20-111:13. Thereafter, Norm Lawrence, the director of another workgroup, invited Plaintiff to give her presentation to his workgroup. Id. at 111:16-112:9. During her

---

[1] The Court states the following facts in the light most favorable to Plaintiff and draws all reasonable inferences in Plaintiff's favor.

presentation, Lawrence introduced Plaintiff to his group and "made the statement that yesterday he would have been considered a bigot and today knowing [Plaintiff] he is rethinking things." Id. at 113:12-25. Sostarecz observed Lawrence make the comment. Id. at 116:15-23. By mid-2005, Plaintiff transitioned her appearance at work from male to female and began using the name "Janis." Stacy Decl. ¶ 6.

Despite Agere's written policy prohibiting gender-identity discrimination, Plaintiff testified that her supervisors treated her differently after she disclosed her GID diagnosis. Pl's Resp. Ex. P-19; Sostarecz Dep. 19:4-20:16. Specifically, Plaintiff testified that Stasak "changed his behavior to [Plaintiff]" and "stopped calling [her] into his office." Stacy Dep. 43:22-24. Plaintiff further testified that on at least one occasion Stasak appeared "visibly nervous" around Plaintiff. Id. at 173:13-18. Plaintiff testified that Sotak referred to her using male pronouns. Id. at 50:7-14, 62:19-63:2, 123:21-23; Stacy Decl. ¶ 10. And Plaintiff testified that two non-supervisor coworkers made negative comments regarding her transition: one coworker commented that Plaintiff was violating "God's will and [she] need[s] to go to religious organizations to seek counsel," and another coworker expressed

3

concern over which bathroom Plaintiff would use.[2] Stacy Dep. 118:7-123:5.

In 2006, after her return from a GID-related surgical procedure, Defendants reassigned Plaintiff to Lawrence's workgroup, and Bob Radaker became her immediate supervisor. Id. at 140:9-19. Plaintiff performed well within her new workgroup and provided valued contributions. Pl.'s Resp. Ex. P-26; Radaker Dep. 13:14-16:6, 19:7-23:11, 40:3-42:12, 51:19-52:19, Oct. 17, 2011. Nevertheless, Plaintiff complained to Lawrence that her performance was unfairly rated and she was unfairly compensated in 2005. Compl. ¶ 50; Lawrence Dep. 222:8-224:1; Garcia Dep. 187:1-12, Oct. 18, 2011. Lawrence investigated and learned that

---

[2] Lawrence testified that he was not aware of negative comments his subordinates made regarding Plaintiff's gender transition. Lawrence Dep. 225:9-12, 294:9-20, Oct. 6, 2011. Plaintiff argues that the testimony of another employee, Patrick Powers, contradicts Lawrence's testimony and indicates that Lawrence was aware of negative comments made regarding Plaintiff's transition and failed to take action.

The evidence of record does not contradict Lawrence's testimony. Powers testified that, during a "closed-door session" with Lawrence, which Powers initiated, Powers mentioned that he was not comfortable with Plaintiff's gender transition but that he "would be an adamant professional at work, and there would be no problems." Powers Dep. 26:8-16, Nov. 18, 2011. Powers further testified that about twenty to thirty individuals made comments regarding Plaintiff's gender transition, but he did not know whether any supervisors commented on her transition. Id. at 58:10-13. And approximately six years after Plaintiff announced her transition (and after her termination), Powers made negative comments on the Internet regarding Plaintiff's gender transition and initiation of the instant lawsuit. This evidence in no way contradicts Lawrence's testimony.

Plaintiff received the exact same performance rating in 2004, before she disclosed her GID diagnosis, and that she was in the top ten percent of the highest paid engineers in the entire company. Lawrence Dep. 227:1-229:4; Stacy Dep. 134:1-21, 136:2-137:23. Lawrence reported his findings to Plaintiff, who admitted to Lawrence that she had no other evidence of any perceived unfair treatment. Lawrence Dep. 228:2-229:24.

In 2007, Agere merged with LSI Corporation.[3] Stacy Decl. ¶ 2. In December 2007, Plaintiff recorded that during a meeting with Lawrence wherein she asked what she needed to do to succeed at the new company, "Norm [Lawrence] mentioned how Chris Kribel had just left the company for a better position in another company and how now that I had completed my changes and

---

[3] LSI's equal employment opportunity policy did not expressly prohibit gender-identity discrimination. Pl.'s Resp. Ex. P-20; Sostarecz Dep. 21:4-9. Plaintiff expressed her concern regarding LSI's policy to Lawrence and made the following record of their conversation:

> I asked Norm [Lawrence] if he could find out about the diversity policy and insurance coverage with the LSI merger. Norm told me it was something to be concerned about and said he would add my question to the list of questions to ask LSI. He said how California is more progressive. I said I could find nothing supporting gender identity or expression within LSI Logic's diversity policy. Norm said he would make sure to find out. Norm then said "nobody ever said things would be easy for me." He also said his current priorities his short term were more high level.

Pl.'s Resp. Ex. D-48.

now I could start someplace fresh. He said he couldn't tell me anything wonderful as a reason to stay." Pl.'s Resp. Ex. D-48.

Following the merger, LSI engaged in a series of layoffs known as the Force Management Program ("FMP") in response to the declining economy.[4] Bento Aff. ¶¶ 6-8. Pursuant to the FMP, Defendants eliminated approximately 3,770 positions between April 2007 and December 2007.[5] Id. ¶ 11.

---

[4] Defendants generally made FMP decisions in the following four steps. First, Defendants determined the scope of the layoff. Sostarecz Dep. 121:18-24; Lawrence Dep. 19:4-20:8. Second, Defendants defined groups or "universes" consisting of individuals under a director at a similar salary grade and geographic location that would be affected by the FMP. Sostarecz Dep. 122:1-8; Lawrence Dep. 30:14-37:4, 35:13-38:9; Kline Dep. 71:5-72:24, 121:3-122:22, Nov. 8, 2011. Third, a decisionmaker conducted a skills assessment of employees within a universe that considered skills needed by the organization going forward. Lawrence Dep. 30:1-31:7, 100:8-101:14; Kline Dep. 65:3-66:23. Fourth, the decisionmaker decided to eliminate a job function or terminate an employee within the universe after taking into account the skills assessment accordingly. Kline Dep. 64:12-66:13, 125:13-126:24; Sostarecz Dep. 122:8-124:20.

[5] Prior to the merger, Agere used the FMP to address deteriorating business conditions. Bento Aff. ¶ 9. On January 1, 2005, Agere employed over 6,150 employees. Id. ¶ 10. By January 1, 2006, Agere reduced its workforce to approximately 5,840 employees. Id. And by January 1, 2007, Agere further reduced its workforce to under 5,200 employees. Id.

Following the merger, Defendants had a combined workforce of over 9,330 employees. Id. ¶ 11. Defendants reduced their workforce to approximately 5,560 employees as of January 1, 2008 - a reduction of approximately 3,770 total employees in an eight-month period. Id. Between January 1, 2008, and April 1, 2008, Defendants further reduced their combined workforce to approximately 5,350 employees - a reduction of another 210 employees. Id. ¶ 12.

In December 2007 or January 2008, Vice President of Product Engineering Scott Keller instructed Lawrence to reduce his workforce by eight employees. Lawrence Dep. 18:9-20:24, 22:1-23:24. Keller instructed Lawrence to terminate four employees from his Austin, Texas, team but gave Lawrence sole discretion to select the other four employees to terminate pursuant to the FMP. Id. at 23:22-24. In making his decision, Lawrence first determined which job positions and functions would be impacted by the FMP. Id. at 30:8-21. Lawrence consulted with Human Resources Business Partner Bonnie Kline regarding the universe of employees that would be affected by the FMP. Id. Kline provided Lawrence with the universes and the members of each universe so that Lawrence could conduct a skills assessment. Id. at 30:8-31:7. Lawrence considered Defendants future needs in determining which universes would be affected by the January 2008 FMP. Id. at 35:15-36:11, 73:24-74:14.

One of Lawrence's universes was Level 12 Principle Product Engineers in Allentown, Pennsylvania. That universe consisted of three employees: Nancy Fang, Robert Kistler, and Plaintiff.[6] Lawrence Dep. 67:11-68:21. Plaintiff, as lead

---

[6] Between Plaintiff's 2005 GID disclosure and her eventual termination in January 2008, Defendants conducted five other FMPs. Lawrence Dep. 319:10-23; Bento Aff. ¶¶ 14-15. None of the affected employees had GID or a disability, nor did their genders play any role in Defendants' decisions. Bento Aff. ¶ 16. At the same time, none of the intervening FMPs targeted

7

engineer, supported a certain product line in which Defendants decided to no longer invest. Id. at 77:22-79:17, 78:6-16; Radaker Dep. 67:8-17, 70:7-71:5, 182:4-7.

Lawrence selected five particular skills critical for the functioning of his team moving forward: execution, teamwork, communication, technical versatility, and customer focus. Lawrence Dep. 38:10-23, 40:1-41:19. When Lawrence assessed Fang, Kistler, and Plaintiff, he ranked Plaintiff lowest of the three, specifically assessing her lower than Kistler and Fang in the critical skills of technical versatility and teamwork.[7] Id. at

---

employees at Plaintiff's job level. Lawrence Dep. 172:13-19; Radaker Dep. 54:5-56:17.

[7] With regard to technical versatility, Lawrence testified that Kistler and Fang each had unique technical skill sets that were valuable to the organization's future business plans. Lawrence Dep. 116:4-122:21. Kistler was leading, and had worked for several years on, DSP development, which was the single biggest product investment in Lawrence's organization. Id. at 116:23-117:21. Kistler was successfully leading product development, and Lawrence did not want to disrupt her progress. Id. Fang joined Lawrence's organization in October 2007 to replace Bob Crispell, with whom Fang worked closely on a number of projects. Id. at 127:3-128:23. Like Crispell, Fang possessed a specific and unique skill set involving mechanical engineering, thermal analysis, and package engineering. Id. at 116:9-22, 127:3-128:23. No one else in Lawrence's organization possessed these critical skills, and Lawrence concluded that he could not terminate Fang because it would completely halt Defendants' future ability to perform package and thermal services. Id. at 120:5-8. Therefore, Lawrence rated Kistler and Fang higher than Plaintiff on the critical skill of technical versatility. Id. at 116:23-120:22.

As for the critical skill of teamwork, Lawrence assessed how the three principle product engineers assisted

116:4-122:21. Lawrence presented his assessment to his first-level managers, Bob Radaker, Larry Wall, James Velopolcak, and Lester Kostolanci. Id. at 104:10-106:19; Radaker Dep. 69:1-71:5. Lawrence discussed the rationale for his skills assessment of the three Level 12 Principle Product Engineers and the business needs of the organization moving forward, and most of the managers agreed with his assessment that Plaintiff was the appropriate employee to terminate.[8] Lawrence Dep. 109:1-122;

---

other employees to communicate their findings and to publish their results to the team. Id. at 120:23-122:8. Fang's job required both a high level of documentation in terms of publishing her results as well as working with every single individual product, and Lawrence determined Fang performed these tasks well. Id. at 121:7-16. Kistler created new processes and procedures, documented them, and taught them to other employees. Id. at 121:17-122:4. Conversely, although Plaintiff did a good job in her product line, Lawrence did not observe her advancing the knowledge of the organization or teaching other engineers the way that Fang and Kistler did. Id. at 121:19-122:4. For these reasons, Lawrence rated Kistler and Fang higher than Plaintiff on the critical skill of teamwork. Id.

[8]     Radaker, however, objected to Plaintiff's termination on two occasions. Radaker Dep. 78:19. On the first occasion, Radaker noted to Lawrence the importance to the whole organization of keeping a diverse skill set within the product engineers because certain experts were terminated in other workgroups. Id. at 78:21-79:5. Second, Radaker noted to Lawrence that the packaging group would be "hit hard" and he attempted to highlight Plaintiff's background and packaging qualifications. Id. at 79:21-80:4. Radaker quieted his objections after Lawrence reminded him that Plaintiff and Radaker were both in the same salary range, and Radaker could also be up for termination in the FMP. Id. at 79:11 ("Eventually, it got to the point where [Lawrence] said, 'Someone with that salary range would be in a list. I can replace [Plaintiff's] name with yours.'").

9

Radaker Dep. 73:1-74:19, 77:2-16. Lawrence decided to terminate Plaintiff based on the skills assessment. Id. at 10:5-13.

On January 16, 2008, Lawrence notified Plaintiff that she was terminated pursuant to the January 2008 FMP. Stacy Dep. 165:2-24; Lawrence Dep. 161:13-162:3. Plaintiff testified that Lawrence provided as a reason for her termination that she "was being freed from [her] negative history with George [Stasak] and the corporation." Stacy Dep. 161:1-4.[9] Plaintiff's termination became effective on March 15, 2008.[10] Id. at 160:11-12.

## II. PROCEDURAL HISTORY

On September 14, 2010, Plaintiff filed a complaint that alleges Defendants committed unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of

---

[9] Plaintiff's notes indicate that Lawrence made the following comment: "Norm [Lawrence] said he thought I needed a 'fresh start' away from my 'negative history and problems' with George [Stasak] and that he didn't believe I would be in his group the entire year." Pl.'s Resp. Ex. D-48.

[10] Defendants replaced Plaintiff with another employee, Michael Savo. See Lawrence Dep. 82:10-18. Radaker testified that he would have preferred that Plaintiff continue because she possessed a more diverse background and skill set. Radaker Dep. 48:10-14. Savo was not within Plaintiff's protected class, possessed lesser skills, and was a lower-level engineer than Plaintiff. Radaker Dep. 45:14-48:14; Lawrence Dep. 306:14-21; see also Savo 2008 Performance Evaluation, Pl.'s Supp. Brief. Ex. R., ECF No. 65 (Savo self-describes as initially lacking a number of the key skills to perform Plaintiff's job and the difficulties he had with performing many of the job duties, such as defining himself as "unskilled" in "Technical Learning.").

1964 ("Title VII") (Counts I and II); sex and disability discrimination and retaliation in violation of the Pennsylvania Human Relations Act ("PHRA") (Counts III, IV, and V); and unlawful gender-identity, sex, and disability discrimination and retaliation in violation of the Allentown Human Relations Act ("AHRA") (Counts VI, VII, VIII, and IX). The parties stipulated to, and the Court approved of, partial dismissal of Plaintiff's claims relating to certain allegations of "post-termination discrimination." Order 1, Jan. 12, 2012, ECF No. 49. Thus, the Court dismissed Counts II, V, and IX. Id.

At the conclusion of the discovery period, Plaintiff moved for partial summary judgment on the issue of whether the AHRA applies in this case. Defendants moved for summary judgment on all of Plaintiff's claims. The Court has reviewed the parties' briefing and the matter is now ripe for disposition.

**III. STANDARD OF REVIEW**

Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the nonmoving party, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

**IV.   DISCUSSION**

Defendants move for summary judgment on Plaintiff's claims of unlawful sex, disability, and gender-identity discrimination. For the reasons that follow, the Court will grant Defendants' Motion and deny Plaintiff's Motion for Partial Summary Judgment as moot.

Plaintiff brings the following claims: sex discrimination in violation of Title VII; sex and disability discrimination in violation of the PHRA; and sex, disability, and gender-identity discrimination in violation of the AHRA.[11] Absent direct evidence of discrimination, a plaintiff may prove claims of unlawful discrimination under the McDonnell Douglas framework.[12] See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Plaintiff bears the initial burden to

---

[11] Title VII makes it unlawful for an employer to discriminate against any individual because of that individual's sex. See 42 U.S.C. § 2000e-2(a)(1) (2006). The PHRA similarly circumscribes unlawful sex and disability discrimination. See 43 Pa. Cons. Stat. Ann. § 955(a) (West 2012). And the AHRA prohibits sex, disability, and "gender identity" discrimination. See Allentown, Pa., Administrative Code tit. 11, art. 181, pt. 3 (2012). The AHRA defines "gender identity" as "self-perception, or perception by others, as male or female, including a person's appearance, behavior, or physical characteristics, that may be in accord with, or opposed to, one's physical anatomy, chromosomal sex, or sex assigned at birth." Id. pt. 2(12).

The parties dispute whether the AHRA is applicable to this case. See Pl.'s Mot. Partial Summ. J. 1, ECF No. 48; Def.'s Resp. Pl.'s Mot. Partial Summ. J. 1, ECF No. 58. For purposes of ruling on Defendant's Motion for Summary Judgment, however, the Court will assume that the AHRA - and the protection it extends against discrimination on the basis of gender identity - applies in this case.

[12] The Court employs the same analysis for Title VII and PHRA discrimination claims. See, e.g., Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 318-19 (3d Cir. 2008). Because the AHRA's provisions prohibiting gender-identity, sex, and disability discrimination are similar to the provisions in Title VII and the PHRA, the Court will also employ the McDonnell Douglas framework to Plaintiff's AHRA claims.

establish a prima facie case of unlawful discrimination. See id. The burden then shifts to Defendants to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff. See id. Finally, Plaintiff must establish that Defendants' proffered reason is a pretext and the real reason Defendants selected Plaintiff for termination was unlawful discrimination. See id. This case turns on whether Plaintiff satisfied her burden at the final stage of the McDonnell Douglas analysis.[13]

Plaintiff may defeat the Defendants' Motion for Summary Judgment "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). "[Plaintiff's] evidence rebutting [Defendants'] proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc

---

[13]  Defendants concede for purposes of summary judgment that Plaintiff may establish a prima facie case of unlawful sex, disability, and gender-identity discrimination. Mot. Summ. J. 3, ECF No. 51. And Defendants proffered sufficient evidence that they terminated Plaintiff based on a legitimate, nondiscriminatory reason – namely, that Lawrence decided to terminate Plaintiff based on the results of a skills assessment comparing three engineers. Thus, the parties dispute whether Plaintiff has satisfied her burden to show Defendants' proffered reason is a pretext.

14

fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id. (citations omitted). Finally, Plaintiff will not discredit Defendants' proffered reason by showing it is "wrong or mistaken" but must, instead, "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Id. at 765 (citations omitted) (internal quotation marks omitted).

Plaintiff attempts to demonstrate Defendants' proffered reason is a pretext based on three arguments.[14] All three arguments fail to demonstrate such weaknesses, implausibilities, or inconsistencies in Defendants' proffered reason that a reasonable factfinder could rationally find them unworthy of credence. Based on the evidence of record, therefore, Plaintiff fails to show Defendants' proffered reason is a pretext.

First, Lawrence's comment that Plaintiff would have a "fresh start" away from her negative history with Stasak does

---

[14] Plaintiff requests, in the alternative to denying summary judgment in favor of Defendants, that the Court deny Defendants' motion pursuant to Federal Rule of Civil Procedure 56(d) based on a then-pending motion to compel. Plaintiff, however, withdrew her argument under Rule 56(d). See Pl.'s Supplemental Resp. 3, ECF No. 65.

not discredit Defendants' proffered reason. To begin with, Lawrence did not expressly refer to Plaintiff's gender, gender-identity, gender-transition, or disability. Nor does Lawrence's comment necessarily indicate an intent to discriminate. Instead, the evidence of record indicates that Lawrence made this comment in an attempt to maintain a forward-looking, positive attitude. In other words, Plaintiff attempts to cast Lawrence's comment in a light unsupported by the evidence of record.

Second, Plaintiff's argument that Lawrence materially changed his explanation for Plaintiff's termination is without record support.[15] In fact, Lawrence provided consistent explanations for Plaintiff's termination. Plaintiff's notice of termination indicated that Defendants chose her for layoff pursuant to the FMP. In August 2008, during an interview of Lawrence triggered by Plaintiff's administrative charge of discrimination, Lawrence explained that he chose Plaintiff based on a skills assessment. Pl.'s Resp. Ex. P-21. That Lawrence also

---

[15] Plaintiff contends Lawrence gave the following four explanations for terminating Plaintiff. First, Lawrence told Plaintiff he terminated her to give her a "fresh start." Second, in his 2008 performance evaluation, he states that he terminated the "lowest performers" in his team during the January 2008 FMP. Third, during an August 2008 interview regarding Plaintiff's administrative charge of discrimination, Lawrence explained that Mike Savo assumed Plaintiff's responsibilities because he was "rated higher" in the skills assessment. And fourth, Lawrence contends he terminated Plaintiff based on the January 2008 FMP skills assessment.

explained that Mike Savo assumed Plaintiff's responsibilities because he was rated higher in the skills assessment does not necessarily contradict Lawrence's explanation – especially considering that Savo was not in Plaintiff's universe relating to the January 2008 FMP. And in his 2008 performance review, Lawrence provided:

> I demonstrated my composure during tough times. An example of this is my handling of the January downsizing in which we eliminated the Austin team and cut Gus's team by half. I demonstrated maturity and decisiveness in taking out the lowest performers from my team and moving Gus's folks into my orb.

Pl.'s Resp. Ex. P-94. Plaintiff argues that Lawrence's use of the term "lowest performers" instead of "lowest skilled" indicates a contradiction in the proffered reason. The Court cannot reasonably infer discriminatory intent based on such a de minimis inconsistency in Lawrence's 2008 performance evaluation.[16] Therefore, Lawrence has not provided such inconsistent explanations for terminating Plaintiff that a reasonable factfinder could rationally find Defendants' proffered reason unworthy of credence.

      Third, Plaintiff's remaining arguments that Defendants' proffered reason is a post hoc fabrication fail.

---

[16] Even more, Lawrence testified that he should have used the term "lowest skilled" instead of "lowest performers" and that he meant no change in meaning. Lawrence Dep. vol. II, 75:12-17, Dec. 22, 2011.

Plaintiff argues that Lawrence did not complete the skills assessment before selecting her for termination, that he did not complete the assessment in "good faith," that Defendants' decision to discontinue a certain product line is immaterial to the skills assessment, and that Defendants fail to provide an explanation for terminating Plaintiff and not her replacement, Mike Savo. First, Plaintiff's arguments are not supported by the evidence of record which demonstrates that, based on the skills Lawrence (and other managers) believed would be most beneficial to Defendants going forward, Lawrence ranked Plaintiff the lowest in her universe. Lawrence selected a universe for the January 2008 FMP and assessed Plaintiff's skills against Kistler and Fang. No evidence of record indicates that Lawrence chose to terminate Plaintiff before the January 2008 FMP or that he ranked Plaintiff based on her gender, gender identity, disability, or any other reason apart from the relevant skills he identified. Plaintiff's attempt to demonstrate that Savo initially struggled in Plaintiff's position ignores the evidence demonstrating that Defendants were discontinuing the product line on which Plaintiff worked and made their decision based on Defendants' future business. And Savo was not among the engineers in Plaintiff's universe in the January 2008 FMP skills assessment. Whether Defendants made an unwise decision in terminating Plaintiff based on the company's future business is

not for the Court to decide. In other words, the Court will not second guess Lawrence's skills assessment or Defendants' decision to discontinue investment in a product line for which Plaintiff was a lead engineer. Nevertheless, Plaintiff fails to demonstrate such inconsistencies or implausibilities in Defendants' proffered reason that a reasonable factfinder could rationally find the reason unworthy of credence. Therefore, Plaintiff fails to demonstrate Defendants' proffered reason is a pretext and the real reason Defendants terminated Plaintiff was unlawful discrimination. Furthermore, because Plaintiff fails to demonstrate Defendants' decision to terminate her was motivated by unlawful discrimination, Plaintiff's Motion for Partial Summary Judgment is moot.

### V. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment as moot. An appropriate order will follow.